HOUSTON, Justice.
Anthony Dwaine Bennett appeals from a summary judgment granted by the trial court in favor of both defendants, Robert Dunn and Dunn’s employer, Marine Specialty Company, Inc.
Bennett, who pleaded guilty to second degree theft for the stealing of a truck and is now serving a 15-year prison sentence for this offense, sought both compensatory and punitive damages from Dunn and Marine Specialty for injuries which Bennett contends he received from Dunn while Dunn was attempting to keep Bennett from stealing Marine Specialty’s truck. Dunn contends that he was defending himself, his family, and his home from an unknown nighttime intruder and that the action was taken to repel the intruder.
Viewed most favorably to Bennett, the facts before the trial court were as follows: The Dunn family — Dunn, his wife, and their 11-month-old baby boy — were asleep in their home. Around 1:30 to 2:00 A.M., Mrs. Dunn was awakened by the barking of their three dogs, which were in the Dunns’ backyard. She awakened Dunn, who looked out his bedroom window and saw the brake lights of the truck entrusted to him by Marine Specialty going on and off. The truck was parked within 20 to 30 feet of his infant son’s bedroom. Dunn ran to the front door, opened the door, stuck his head out, and yelled at the “dark blob” in the truck. Realizing that he did not know whether the intruder had any weapons or whether there were accomplices elsewhere in the yard, Dunn quickly shut and locked the door and told his wife to call the police. Dunn put on some clothes, loaded his .22-caliber rifle, and went back to the front door. With his rifle in hand, Dunn walked almost to the end of the walk leading to his driveway and kept yelling for the “dark blob” to leave. The windshield wipers in the truck were being turned on and off. The truck’s radio was on and the volume was being turned up and down. The intruder in the truck was not deterred by the barking of the dogs, Dunn’s yells, or the sight of Dunn’s rifle. Dunn fired three or four shots into the air in an attempt to scare the intruder into leaving or to evoke a response. The shots accomplished neither, and Dunn retreated to his living room. The intruder cranked the truck and Dunn stepped out of the living room and unsuccessfully attempted to “shoot out” the tires of the truck. The truck rammed into the back of Dunn’s personal vehicle twice. Bennett, according to his affidavit, without saying anything to Dunn, opened the door to the truck. Dunn, unsure what the “crazy” intruder would do next, shot approximately five shots at the windshield of the truck, aiming at the “dark blob.” The truck then backed out of the yard, crossed the street, and went into a drainage ditch. The driver accelerated quickly, and Dunn, thinking that the driver was trying to run him down, retreated to the living room. The truck entered the drainage ditch on Dunn’s side of the street, dodged a utility pole, and made it to the road, where it was driven away. During the few minutes that all of this took, Dunn was afraid.
Given these circumstances — the late hour, with Dunn being aroused from his sleep; the failure of the intruder or intruders to respond to the barking of the dogs, to the yells to “Get out of there,” or to the warning shots; the erratic behavior of the intruder in the truck; and the proximity of the truck to the house in which the family was sleeping — Dunn’s apprehensions of danger to himself and his family were not *453 unreasonable, and his actions taken to protect his family, himself, and his home were fully justified.
Examining the circumstances from Dunn’s perspective at the time of his action, as the law requires, Suell v. Derricott, 161 Ala. 259, 49 So. 895 (1909), we find that Dunn acted out of a reasonable and well founded apprehension that he, his wife, and his 11-month-old baby were in danger. The law does not require that a man retreat when defending his home and allows him to use whatever force is necessary to remove the danger.[1]
The evidence in opposition to the motion for summary judgment is that Bennett had become “heavily intoxicated” and had smoked marijuana, which resulted in his having a memory loss and waking up in the cab of the truck in Dunn’s yard not knowing where he was. This does not in any way make it a fact question as to whether Dunn’s actions were reasonable and fully justified. Bennett had every opportunity to retreat or to verbally respond to Dunn. This he failed to do.
Subsequent factors strengthen our position that Dunn’s action was not unreasonable and that his actions to protect himself and his family were justified. When Bennett was arrested, Bennett pounded his head against the window of the police car, apparently trying to break it in order to get out. The police were forced to transfer Bennett to a paddy wagon, and in it he threw himself against the sides. Bennett continued to act “crazy” after he left the yard of the Dunn home, and we cannot surmise what he may have done at the Dunn home if he had not been forced to leave.
Just prior to Bennett’s scheduled criminal trial for theft of property in the first degree, at which Dunn and his wife would have been required to testify against Bennett, Bennett filed this civil action against Dunn and the owner of the truck which Bennett was indicted for stealing, charging assault and battery and seeking compensatory and punitive damages. Bennett, who had a previous conviction for burglary, pleaded guilty to second degree theft of the truck from the Dunns’ yard and is now in prison.
Dunn did no more than the law allows. According to the materials before the court, he was entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.
AFFIRMED.
TORBERT, C.J., and JONES, ALMON, SHORES and STEAGALL, JJ., concur.
MADDOX and BEATTY, JJ., dissent.
ADAMS, J., not sitting.

. See the essay “Violence in American History: The Homestead Ethic and ‘No Duty to Retreat’" by Richard Maxwell Brown, which appears at pages 97-124 in Dr. Taylor Littleton’s The Rights of Memory: Essays on History, Science and American Culture (University of Alabama Press 1986), for an interesting discussion of the integration of the social doctrine of the homestead ethic and the American legal doctrine of no duty to retreat, which are products of our 17th-, 18th-, and 19th-century past.